IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

PEDRO J GRANT,

      Plaintiff,

v.                              CASE NO. 1:09-cv-00104-MP-GRJ

MIKE HENDERSON,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is the Dispositive Motion of Mike Henderson to Dismiss for Failure to Exhaust Administrative Remedies Pursuant to 42 U.S.C. §1997e(a). (Doc. 42.)[1] Plaintiff has filed two responses in opposition (Docs. 43, 48) to which Defendant has filed a reply (Docs. 54 & 55.) and, therefore, the matter is ripe for review.

For the reasons discussed below the Dispositive Motion of Mike Henderson to Dismiss for Failure to Exhaust Administrative Remedies Pursuant to 42 U.S.C. §1997e(a) (Doc. 42) is due to be **GRANTED**.

## I. BACKGROUND AND FACTS

According to Plaintiff, on September 26, 2008, while he was in custody at the North Florida Evaluation and Treatment Center (NFETC), Plaintiff requested permission from Mike Henderson ("Henderson"), a staff member, to use the phone to call the Social Security Office about Plaintiff's citizenship.[2] Plaintiff alleges that Henderson told Plaintiff

---

[1] Defendant also has filed Supplemental Exhibits in support of the motion. Doc. 44.

[2] Pl.'s Compl., Doc. 5.

he could use the phone when the shift supervisor granted authorization.[3] Later, Plaintiff asked Henderson again about the phone and was told "I'll give you a call when I'm ready, not when your [sic] ready and if you bother me again I will show you exactly who Mike Henderson is."[4] Plaintiff alleges that he returned to his room and while he was undressing Defendant entered and began striking him numerous times in the face and head.[5] Plaintiff claims that Henderson laughed as he continued beating Plaintiff until other staff members came into the room with a video recorder.[6]

Defendant Henderson attests that Plaintiff never asked him about the phone. Rather, Henderson avers that Plaintiff began screaming at co-workers Marjorie Pernell and Fred Goston about Plaintiff's right to have the portable phone when Henderson intervened and requested that Plaintiff return to his room to quiet down.[7] According to Henderson, he followed Plaintiff to the door of Plaintiff's room at which time Plaintiff took his shirt off and exclaimed, "I'll show you m—— f-----," and acted like he wanted to fight ultimately striking Henderson in the forehead with Plaintiff's right fist.[8] Henderson then pushed Plaintiff onto the bed and with the help of Pernell and Goston held Plaintiff down until security arrived.[9] Henderson''s head was examined and then Henderson met with

---

[3] Id

[4] Id.

[5] Id.

[6] Id.

[7] Mike Henderson Aff. 1 (Doc. 44, Exhibit 5).

[8] Id.

[9] Id.

the medical director to view the video of the incident and discuss Henderson's actions, which were deemed proper in light of the circumstances.[10]

Henderson denied ever striking Plaintiff or laughing during the incident.[11]

Plaintiff claims that he has "written complaints to supervisors and spoke with shift supervisors" about what happened with "negative results," and he also wrote to an advocacy center who investigated the incident.[12]  However, Plaintiff admitted later in his response to the motion to dismiss that he never filed a written grievance regarding the incident.[13]

Taj Allen ("Allen") was Henderson's supervisor on September 26, 2008, and remained so through the date of his affidavit.  Allen attests that he was never contacted about a problem or written grievance concerning Plaintiff and Henderson. Further, Allen would have been informed had Plaintiff spoken with anyone or filed a grievance with anyone about Henderson.[14]  Allen recalls that on the night of the incident Plaintiff was placed in an observation room and assessed by medical personnel, who documented that Plaintiff did not have any serious injuries.[15]  A few hours later, Plaintiff moved to a part of the room out of sight of staff and did not respond to their calls to remain in

---

[10] Id.

[11] Id.

[12] Id.

[13] Pl.'s Amended Resp. (Doc. 48).

[14] Taj Allen Aff.  (Doc. 42, Exhibit 1).

[15] Id.

sight.[16]  When Plaintiff was next observed he had the injuries Plaintiff now alleges were caused by Henderson.[17]

Plaintiff claims that he suffered a broken nose, internal bleeding, and a concussion as a result of Henderson's beating, and that he was taken to an outside hospital for treatment.[18]  Plaintiff claims to have continuing physical and mental injuries from the incident and seeks compensatory and punitive damages of $500,000.00 and $1,000,000.00 respectively.

## II. <u>STANDARD OF REVIEW</u>

Although Defendant's motion recites that it is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, because the issue is whether Plaintiff has exhausted his administrative remedies, the Court is not restricted to consideration of only the facts alleged in the complaint. Rather, where the issue is whether the prisoner has exhausted his administrative remedies, the Court is required to treat the motion as having been brought under Rule 12(b) and thus "is subject to the rules and practices applicable to the most analogous Rule 12(b) motion.[19]  The reason the Court is permitted to view matters outside the four corners of the Complaint is "because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits."[20] Thus, "an exhaustion defense ... is not ordinarily the proper

---

[16]  <u>Id.</u>

[17]  <u>Id.</u>

[18]  <u>Id.</u>  The true extent of Plaintiff's injuries are unknown and not before the Court on this motion.

[19]  <u>Bryant v. Rich</u>, 530 F.3d 1368, 1376 (11th Cir. 2008).

[20]  <u>Id.</u>

subject for a summary judgment; instead, it 'should be raised in a motion to dismiss ...'"[21]

Further, even though the Court may consider matters outside the pleadings to decide

exhaustion, it is not necessary to convert the motion to a motion for summary

judgment.[22]

## III. <u>Exhaustion</u>

Pursuant to 42 U.S.C. § 1997e(a): "No action shall be brought with respect to

prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." The exhaustion requirement of § 1997e(a) is

mandatory, whether the claim is brought pursuant to § 1983 or <u>Bivens</u>.[23]   There is no

discretion to waive this requirement or provide continuances of prisoner litigation in the

event that a claim has not been exhausted prior to filing.[24]  Furthermore, this Court may

not consider the adequacy or futility of administrative remedies, but only the availability

of such.[25]  Even where an inmate seeks only monetary damages in a civil rights case, he

must complete the prison administrative process if it could provide some sort of relief on

---

[21]   <u>Id.</u>

[22]   <u>Id</u>. at 1374-76.

[23]   <u>Alexander v. Hawk</u>, 159 F.3d 1321, 1324-26 (11th Cir. 1998).

[24]   <u>Id.</u> at 1325; *see also* <u>Porter v. Nussle</u>, 534 U.S. 516 (2002) (holding that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); <u>Higginbottom v. Carter</u>, 223 F.3d 1259, 1260-61 (11th Cir. 2000) (holding that an excessive force claim is subject to the exhaustion requirement); <u>Brown v. Sikes</u>, 212 F.3d 1205, 1207-08 (11th Cir. 2000) (finding that an inmate must "provide with his grievance all relevant information reasonably available to him" but he cannot be required to name individuals responsible for challenged conduct when he could not yet identify those persons).

[25]   <u>Higginbottom</u>, 223 F.3d at 1261, *citing* <u>Alexander</u>, 159 F.3d at 1323.

the complaint although no money could be given administratively.[26]  An inmate must not only commence the grievance process, he must perfect his appeal to the highest administrative level in the process.[27]

There is a detailed grievance process in place at the NFETC, which includes both formal and informal procedures, the purpose of which is "to provide satisfactory determination of the validity, ensure appropriate review of issues through Center channels, improve resident satisfaction and empower residents to appropriately address unresolved concerns."[28]  The procedure is also designed to ensure that "resident complaints and unresolved issues will be addressed in a "systematic, timely, thoughtful manner" and ensure "accessibility to the grievance system as a means of conflict resolution."[29]

Under the grievance procedures at NFETC, residents (i.e. inmates) are encouraged to resolve any issues as soon as possible informally with staff members, who are expected to assist residents in resolving their issues.[30]  Suspected cases of abuse are to be reported immediately and staff members must take immediate action whenever life-safety issues are reported.[31]  If the resident is unable to resolve the issue informally, he may file a Formal Complaint or report directly to the Resident Relation

---

[26]  <u>Booth v. Churner</u>, 531 U.S. 956 (2001).

[27]  <u>Alexander</u>, 159 F.3d at 1323.

[28]  NFETC OP #4800 (Doc. 42, Exhibit 3).

[29]  <u>Id.</u>

[30]  <u>Id.</u>

[31]  <u>Id.</u>

Coordinator, the Assistant Administrator, the Administrator, the Abuse Registry, Local Client Relations, or the Advocacy Center.  Phones are made available for this pursuant to NFETC OP #4260.[32]  If the resident is not satisfied with the solution of the complaint, or does not wish to use the informal procedure, he may file a complaint form in writing using either the Resident Complaint Notification Form or on any paper available to him.[33] Assistance to complete the complaint is available to the resident if he contacts the Resident Relations Office.[34]  Building Managers are required to ensure the forms or other paper are always available to each resident assigned to their respective building.[35] The forms are also available through the resident's counselor and are readily accessible to each resident in the common use area of each building.[36]  Envelopes are also available in the building Control Room.[37] The completed forms, in an envelope, are to be addressed to "Resident Relations Office, Building 2" and may be sent through the campus mailbox or by request that a member of the treatment team contact the Resident Relations Office.[38]  The form will be picked up within one (1) working day.[39] Issues received through the Resident Relations Office will be assigned to the Building

---

[32]  Id.

[33]  Id.

[34]  Id.

[35]  Id.

[36]  Id.

[37]  Id.

[38]  Id.

[39]  Id.

Manager or Department Head for follow up.[40]  The assigned person is required to

investigate thoroughly and to report his/her findings to the Resident Relations Office

within seven (7) days.[41]  The investigator meets with the resident regarding the

conclusions drawn and the resident is advised of his right to appeal the findings.[42]

Unresolved issues are attempted to be resolved by the Resident Relations Coordinator

or the resident may appeal the issue to the Center Administrator for review within seven

(7) working days.[43] Under appropriate circumstances, matters may be referred directly to

the Resident Relations Coordinator and time frames may be extended by the Center

Administrator.[44]

## III.  DISCUSSION

Plaintiff concedes that no grievances were filed, but contends that his mental

illness and English language barriers prevented him from filing a grievance and that no

one at NFETC advised him of the process either before or after the incident.[45]  Plaintiff

also contends that he was under the influence of large doses of psychotropic medication

(200 mg Seroquel in the morning and 600 mg of Seroquel at night) and could not

---

[40] Id.

[41] Id.

[42] Id.

[43] Id.

[44] Id.

[45] Pl.'s Resp. 2 (Doc. 43).

understand his rights.[46]  Plaintiff remained at NFETC until January 20, 2009, 115 days

after the alleged incident, and despite the fact that he took medication he was deemed

competent to proceed to court on his pending criminal charges.[47]

Plaintiff's argument fails for two fundamental reasons. First, Plaintiff's assertion

that he was unable to understand the grievance process - even if accepted - does not as

a matter of law fall with the narrow exceptions to the mandatory exhaustion

requirements. Secondly, the record before the Court does not support Plaintiff's claim

that he was unable to understand the exhaustion process but rather fully supports the

conclusion that Plaintiff was aware of the process and could have, if he so chose,

pursued his available administrative remedies.

The Court will turn first to the issue of whether Plaintiff's alleged inability to

understand English would be sufficient to except Plaintiff from having to administratively

exhaust his claims before filing suit.

The United States Supreme Court in <u>Woodford v. Ngo</u>[48] reaffirmed that the

exhaustion requirement of the Prisoner Litigation Reform Act (PLRA) is mandatory and

necessary.[49]  In <u>Woodford</u>, the Supreme Court referred to exhaustion as the

"centerpiece" of the PLRA,  and cited with approval the Eleventh Circuit's position that

exhaustion is a mandatory provision, no longer left to the discretion of the district court,

---

[46]  Pl.'s Amended Second Resp.  (Doc. 48). Included in this response was Plaintiff's request to amend his complaint and explain further why he did not exhaust the grievance process, which the Court denied.  (Docs. 47 and 50).

[47]  Debbie McKenzie Aff. 2.  (Supp. Ex.to Def.'s Reply, Doc. 55, Exhibit 1)

[48]  548 U.S. 81 (2006).

[49]  <u>Woodford v. Ngo</u>, 548 U.S. 81 (2006).

and that a prisoner must complete the process as the institution requires, including appeals.[50]  As the <u>Woodford</u> court pointed out exhaustion is mandatory because it provides prisoners with an effective incentive to use the process, which gives the institution a fair opportunity to correct its own errors; and thereby, reduces the number of prisoner suits and improves the quality of the lawsuits that are filed in federal court.[51] Additionally, exhaustion "often results in the creation of an administrative record that is helpful to the court.  When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved."[52]

The requirement that administrative remedies must be exhausted is not subject to waiver by the court or excused because of futility or inadequacy of the remedies.[53] Indeed, the only circumstances where courts have found exhaustion was not required are extremely narrow and involved situations where the circumstances rendered the remedies "unavailable."   Such circumstances include where the inmate could not have known of the grievance process through reasonable effort;[54] when prison officials made serious threats of substantial retaliation to a prisoner;[55] or where prison officials took

---

[50]  <u>Id.</u> at 87.

[51]  <u>Id.</u> at 94-97.

[52]  <u>Id.</u>

[53]  <u>See</u> <u>Booth</u>, 531 U.S. 956 at 741 n. 6;  <u>Alexander,</u>159 F.3d at 1324-26.

[54]  <u>Goebert v. Lee County</u>, 510 F.3d 1312 (11th Cir. 2007)(the appeal step not taken by the inmate was not referenced in the inmate handbook and the inmate could not have known this was a requirement until the inmate obtained a copy of the jail operating procedures in discovery three years later).

[55]  <u>Turner v. Burnside</u>, 541 F.3d 1077, 1084 (11th Cir. 2008).

direct and significant actions to thwart the grievance process.[56]

None of these circumstances are present in this case. The grievance process at NFETC is well articulated to the residents. Karen McNally, Resident Advocate Mentor, attests that she explained the grievance process to Plaintiff when he entered the facility, including giving Plaintiff the handbook, which was in English because he understood and spoke English with her.[57] The grievance process was also posted in Plaintiff's "pod" and he had access to Spanish speaking staff to translate for him as he requested.[58] Thus, there is simply no suggestion in this case that Plaintiff did not know of the grievance process or could not have known of the requirements of the grievance process through even a modicum of effort. Moreover, there is no suggestion in this case that prison officials retaliated against Plaintiff or took any action to thwart Plaintiff from pursuing the grievance procedures. Accordingly, as a matter of law, Plaintiff's failure to pursue the available administrative remedies is a bar to Plaintiff bringing this suit and thus mandates dismissal of the complaint.

In addition to the fact that Plaintiff's reasons for failing to pursue his administrative remedies do not as a matter of law excuse the requirement that Plaintiff exhaust his remedies, a review of the record does not support Plaintiff's assertion that mental illness and English language barriers prevented him from filing a grievance and that no one at

---

[56] <u>Aceves v. Swanson</u>, 75 F.Appx. 295, 296 (5th Cir. 2003)(prison officials refused to give grievance forms); <u>Ziemba v. Wezner</u>, 366 F.3d 161, 163 (2nd Cir. 2004)(inmate beaten and immediately transferred out of state); <u>Mitchell v. Horn</u>, 318 F.3d 523, 539 (3rd Cir. 2003)(inmate held in cell for four days without food, water, or sleep and refused forms); <u>Miller v. Norris</u>, 247 F.3d 736, 738 (8th Cir. 2001)(inmate refused grievance forms after repeated requests).

[57] Karen McNally Aff. (Doc. 44, Exhibit 3).

[58] <u>Id</u>.

NFETC advised him of the process either before or after the incident.

Turning to Plaintiff's claim that his lack of English skills prevented him from filing a grievance, Plaintiff has provided letters to and from The Advocacy Center, a state agency designated by the Governor of Florida to protect the rights of persons with disabilities, who investigated Plaintiff's claims that he was denied a translator after the alleged abuse incident.[59]  In a letter to Barbara Ross, Adult Protective Investigator Supervisor at the Department of Children and Family, dated February 9, 2009, the Center noted that Plaintiff was not provided a Spanish translator during the investigation of the incident by David Cunningham, although Plaintiff requested one, and that Plaintiff's medical records at NFETC reflect that his comprehension of English reduced significantly when under pressure.[60]  Written materials provided to Plaintiff were in English, although there were Spanish materials available on the DOC website.[61]  Review of notes taken during the investigation by Mr. Cunningham disclose that while there was some issue with Plaintiff's ability to speak English it was unclear if it was authentic or antisocial.[62] The investigation by Cunningham was closed after concluding that normal force was used by Henderson during the restraint.[63]  The Advocacy Center listed a number of "deficiencies in the documentation of the investigation," and requested a

---

[59]  Pl.s's Resp. 6. (Doc. 43).

[60]  (Doc. 43 at 7).

[61]  Id.

[62]  Id.

[63]  Id. at 8

number of items from Barbara Ross.[64]

Additional information was requested from NFETC on the same date, February 9, 2009. The request referred to conflicting information in Plaintiff's file regarding his English fluency, specifically that Dr. Eric Mings reported that Plaintiff took classes in college in the United States, and Dr. Jeffrey Danziger reported that Plaintiff had only 4 years of formal education.[65] The letter also referenced inconsistencies by NFETC staff members regarding Plaintiff's ability to speak English. Specifically Jim Godwin noted that Plaintiff was fluent in English, but that Plaintiff would work on his skills. Nurses notes reflected that Plaintiff was not fluent, but could communicate on a daily basis and that translators would be used for evaluations.[66]

According to Jim Godwin – Plaintiff's counselor during the seven months Plaintiff was at NFETC and who worked with Plaintiff on a daily basis to assure that Plaintiff learned competency material sufficient to assist in his defense at trial – Plaintiff "was malingering his mental illness in order to prevent going to trial" and that Plaintiff "was able to speak, read and write excellent English, as demonstrated by his Response to Defendant's Motion to Dismiss."[67] Godwin attests that translators were provided during meetings of a complicated or technical nature. Moreover, there were a number of written materials prepared by Plaintiff and sent to Social Security and the FBI, which exhibited that Plaintiff did not have any difficulty with English and even had the ability to grasp

---

[64] Id.

[65] Id. at 11-12

[66] Id. at 12.

[67] Jim Godwin Aff. (Doc. 44, Exhibit 1).

"complicated legal nuances" in English.[68]  Godwin attests that it is standard procedure for new residents at NFETC to receive a handbook informing them of grievance procedures and to meet with the Resident Advocate, Joe Milligan, to review the handbook with them.[69]

Joseph Milligan, in his affidavit, explained that it was his job to investigate and mediate resident complaints and grievances.[70]   Milligan kept a list of all such complaints and there was no written complaint from Plaintiff regarding Defendant and the alleged incident on September 26, 2008.[71]  According to Milligan, his records disclose that Plaintiff was visited by David Cunningham, an Adult Protective Investigator, the day after the incident and no report or other communication was made by Cunningham to Milligan regarding the substance of this visit.[72]

David Cunningham attests in his affidavit that during his first interview with Plaintiff on September 27, 2008, Plaintiff requested a Spanish translator because he did not want to be overheard by staff members and feared he might be misunderstood in English.[73]  The interview was ended and Cunningham returned on November 24, 2008, with a Spanish translator. According to Cunningham, the Advocacy Center's letter to the

---

[68]   Id.

[69]   Id.

[70]   Joseph Milligan Aff. (Doc.42, Exhibit 2).

[71]   Id.

[72]   Id.

[73]   David Cunningham Aff. (Doc. 44, Exhibit 2).

contrary, is inaccurate.[74]  It is true that all written materials provided to Plaintiff were in English, but at no time did Plaintiff request otherwise.[75]  Cunningham concluded from his investigation that Plaintiff became violent towards Henderson who used an Aggression Control Technique (ACT) that resulted in an accidental injury.[76]

Karen McNally, Resident Advocate Mentor, attests that she explained the grievance process to Plaintiff when he entered the facility, including giving Plaintiff the handbook, which was in English because he understood and spoke English with her.[77] The grievance process was also posted in Plaintiff's "pod" and he had access to Spanish speaking staff to translate for him as he requested.[78]

Twilla Jenkins-Collins was Building Manager for Plaintiff and she remembers Plaintiff specifically because "he complained a lot."[79]  During Plaintiff's stay at NFETC, there were three Spanish speaking counselors in Plaintiff's building who worked with any residents who had language difficulties.[80] Although the handbooks were in English,[81] the grievance process was explained to Plaintiff orally in English and Spanish and was

---

[74]  Id.

[75]  Id.

[76]  Id. 5.

[77]  Karen McNally Aff. (Doc. 44, Exhibit 3).

[78]  Id.

[79]  Twilla Jenkins-Collins Aff.  (Doc. 44, Exhibit 4).

[80]  Jenkins-Collins Aff.1-2.

[81]  English NFETC Resident Handbook (Doc. 44, Exhibit 6).

included in the Forensic Client's Notice of Rights,[82] which was posted in the building in both English and Spanish.[83]

Further, the results of Plaintiff's competency evaluation underscore that Plaintiff's English was adequate. In relevant part the evaluation states:

> Mr. Grant's command of English is adequate to enable him to address personal issues with several agencies independently although he has, at times, spoken to Spanish speaking representatives of these agencies. Mr. Grant has communicated independently by telephone and in written correspondence with agencies including immigration, social security and the FBI. Furthermore, he has a computer disc in the library that he has produced containing a compilation of his correspondence. A translator was used on occasions at this facility to verify and clarify communications between Mr. Grant and his treatment team. On one occasion, a translator was utilized to assure clarity and comprehension of a review of a specific conflict/incident between Mr. Grant and a staff member as well as other complaints/issues that he had with staff. A translator was also utilized to assure that Mr. Grant understood the nature of forms he requested filled out for immigration requiring a physician signature as well as the content and opinions entered on the form. The form competency evaluation was completed with a translator present, and was done so primarily in English with minimal translation required.[84]

Plaintiff has attached several documents to his two responses establishing that the Advocacy Center investigated his case and corresponded with him in both English and Spanish.[85] Plaintiff also provided portions of medical records which show that he was on several medications, and it was recommended that he have a Spanish-speaking attorney assist him at trial.[86] Also attached is a document entitled, "Amended Resident

---

[82] Rights for Forensic Clients in English (Doc. 44, Exhibit 7) and Spanish (Exhibit 8).

[83] (Doc. 44, Exhibits 7 and 8).

[84] Competency Evaluation to the Court dated 12/11/08 (Doc. 44, Exhibit 7).

[85] Pl.'s Resp. (Doc. 43, Exhibits); (Doc. 48, Exhibits A-B)

[86] Pl.'s Second Amended Resp. (Doc. 48, Exhibits A-B)

Complaint," which is undated, addressed to "NFETC, Attn: William S. Baxter," and concerns the incident on September 26, 2008.[87]

While English was not Plaintiff's first language, the record does not support a finding that Plaintiff was unable to learn of the grievance procedures because of language deficiencies. Rather, the record fully supports the conclusion that Plaintiff's mastery of the English language was sufficient to understand that a grievance process was in place at the NFETC, the available procedures and how to implement the process.[88]

For example, the staff at NFETC – who were familiar with Plaintiff on a daily basis – found Plaintiff was capable of expressing himself and understanding issues of some complexity, such as social security and immigration. Observations of Plaintiff's language skills were reported in his competency review and include numerous phone calls, letters, and discussions about complex issues with agencies such as the FBI, immigration and social security, without the assistance of a translator. Further, staff members reported that Plaintiff was advised about the grievance process in Spanish by at least one person. Moreover, there were Spanish notices posted at Plaintiff's building advising him of his rights, and there were three Spanish-speaking persons working at his building who were available on a daily basis to help residents with language issues. Thus, the record fully supports the conclusion that Plaintiff's English language skills were sufficient to allow

---

[87] Pl.'s Second Amended Resp. (Doc. 48, Exhibit C). Plaintiff does not suggest and the Court does **not** consider this to be evidence that a written complaint was submitted at the time the incident occurred. Plaintiff has admitted that he never filed a written complaint or otherwise attempted to access the grievance process. Plaintiff's purpose in submitting this paper remains unclear.

[88] In deciding whether administrative remedies have been exhausted, the judge is the finder of fact. Bryant, 530 F.3d at 1374.

him to pursue the available grievance procedures – and to the extent that there were any deficiencies in Plaintiff's English language skills – there were sufficient materials available in Spanish and translators available if necessary to provide assistance.

Simply put, there were multiple avenues available for Plaintiff to avail himself of the grievance process. Plaintiff could have made an oral grievance to any staff member with whom he came in contact. He could have filed a written grievance to any number of persons, and he even could have used a telephone to call several persons whose job it was to manage client grievances. Furthermore, Plaintiff was in contact with numerous staff members in the 115 days after this incident, three of whom spoke Spanish and worked in Plaintiff's building. Despite all of these opportunities and avenues Plaintiff failed to ask even one person to assist him in filing a grievance.[89]

Accordingly, for all of these reasons – even if language barriers could excuse the mandatory requirement that Plaintiff exhaust his administrative remedies – the Court concludes that the record does not support Plaintiff's contention that his English language barriers prevented him from filing a grievance or that no one at NFETC advised him of the process either before or after the incident.

## IV.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that Defendant's Motion to Dismiss for Failure to Exhaust Administrative Remedies (Doc. 42) should be

---

[89] Lastly, there is no record support for Plaintiff's contention that he was too medicated to understand his rights. This issue was raised for the first time in Plaintiff's Amended Response to the Motion to Dismiss and Plaintiff has offered nothing to support his claim that mental illness prevented him from filing a grievance. While Plaintiff may have been prescribed psychotropic drugs, there is no evidence of record suggesting that Plaintiff was rendered incapable of understanding his rights because of medication. Indeed, Plaintiff was administered medication and admitted to the facility for the very purpose of stabilizing Plaintiff to assist in his legal defense.

**GRANTED**, and this case should be **DISMISSED**.

At Gainesville, Florida, this 7th day of February, 2011.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**